UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIZABETH ALVARADO, ERICKA
AGUILAR, WANDA AZU NIEVES, *and*
MARIE WOOD SMITH,

                              Plaintiffs,

        v.

UNITED HOSPICE, INC., CARA
DANIELLE PACE, *and* JUDITH
PEACOCK,

                              Defendants.

No. 20-CV-10790 (KMK)

OPINION & ORDER

Appearances:

Richard Cardinale, Esq.
Attorney at Law
Brooklyn, NY
*Counsel for Plaintiffs*

Stephen Bergstein, Esq.
Bergstein & Ullrich
New Paltz, NY
*Counsel for Plaintiffs*

Gregory B. Reilly, Esq.
Theresa Rudnak, Esq.
Bond, Schoeneck & King, PLLC
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Elizabeth Alvarado ("Alvarado"), Ericka Aguilar ("Aguilar"), Wanda Azu Nieves

("Nieves"), and Marie Wood Smith ("Wood Smith"; collectively, "Plaintiffs") bring this Action

against United Hospice, Inc. ("United Hospice"), Cara Danielle Pace ("Pace"), and Judith

Peacock ("Peacock"; collectively, "Defendants"), alleging that Defendants unlawfully

discriminated and retaliated against them on the basis of their race and ethnicity over the course

of Plaintiffs' employment with United Hospice in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq.; 42 U.S.C. § 1981; and the New York State

Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.  (*See generally* Compl. (Dkt. No. 1).)

Nieves additionally claims that United Hospice discriminated against her on the basis of her

disability by failing to provide her with her requested accommodation, in violation of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132, et seq.  (*See id.*)  Before the

Court is Defendants' Motion for Summary Judgment (the "Motion").  (*See* Not. of Mot. (Dkt.

No. 64).)  For the following reasons, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Rule 56.1,

(*see* Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 67); Pls.' Rule 56.1 Statement ("Pls.'

56.1") (Dkt. No. 74-1)), and the admissible evidence submitted by the Parties.  The facts are

recounted "in the light most favorable to" Plaintiffs, the non-movants.  *Torcivia v. Suffolk*

*County*, 17 F.4th 342, 345 (2d Cir. 2021).  The facts as described below are in dispute only to the

extent indicated.[1]

---

[1] Where the Parties "identify disputed facts but with semantic objections only or by
asserting irrelevant facts, . . . which do not actually challenge the factual substance described in
the relevant paragraphs, the Court will not consider them as creating disputes of fact."  *New
Jersey v. N.Y.C. Dep't of Educ.*, No. 18-CV-6173, 2021 WL 965323, at *2 n.1 (S.D.N.Y.
Mar. 15, 2021) (quoting *Gjini v. United States*, No. 16-CV-3707, 2019 WL 498350, at *1 n.4
(S.D.N.Y. Feb. 8, 2019)); *see also Nimkoff v. Drabinsky*, No. 17-CV-4458, 2021 WL 4480627,
at *1 n.2 (E.D.N.Y. Sept. 30, 2021) ("[T]o the extent a party's Rule 56.1 statement improperly
interjects arguments and/or immaterial facts in response to facts asserted by the opposing party
without specifically controverting those facts [with admissible evidence], the [c]ourt has
disregarded the statement." (quotation marks and alterations omitted)); *Baity v. Kralik*, 51
F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a
number of [the plaintiff's] admissions—improperly interject arguments and/or immaterial facts

1.  Background to the Parties

United Hospice is a non-profit organization located in Rockland County that provides palliative end-of-life care services to individuals facing serious illnesses and their families.  (*See* Defs.' 56.1 ¶ 1; Pls.' 56.1 ¶ 1; *see also* Answer ¶¶ 14, 17 (Dkt. No. 19).)  Such services—which are provided in patient homes, skilled nursing homes, group homes, assisted living facilities, and the Joe Raso Hospice Residence ("JRHR")—include health care, residential care, bereavement services, and education for both patients and their families.  (*See* Answer ¶ 17.)  As relevant to this Action, hospice services—such as those provided by United Hospice—are usually covered by Medicare, Medicaid, or private insurance, though United Hospice also receives grants to support its operations and programming.  (*See id.* ¶ 18.)  Pace is a White woman and has been United Hospice's Chief Executive Officer since June 12, 2020.  (*See id.* ¶ 15.)  Pace was originally hired by United Hospice in April 2019 as Chief Administrative Officer; sometime thereafter, her title was changed to Chief Operating Officer before it was changed to Chief Executive Officer.  (*See id.*)  Peacock is a White woman and is United Hospice's Director of Clinical Services.  (*See id.* ¶ 16.)

Plaintiffs are all former employees of United Hospice.  (*See* Defs.' 56.1 ¶ 3; Pls.' 56.1 ¶ 3.)  Alvarado is a Hispanic woman and United Hospice's former Director of Counseling Services; in this role, Alvarado was responsible for the management of United Hospice's social workers and bereavement services staff and reported to Peacock.  (*See* Defs.' 56.1 ¶¶ 3, 4; Pls.'

in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant['s] asserted facts without specifically controverting those same facts. . . .  [A] number of [the] [p]laintiff's purported denials quibble with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the] [d]efendant[].").

Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 submissions.  However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

56.1 ¶¶ 3, 4; Decl. of Elizabeth Alvarado in Opp'n to Mot. ("Alvarado Decl.") ¶ 5 (Dkt. No. 75).)  Aguilar and Nieves are also Hispanic women and were formerly social workers at United Hospice; both Aguilar and Nieves reported to Alvarado.  (*See* Defs.' 56.1 ¶ 3; Pls.' 56.1 ¶ 3.)  Wood Smith is a Black woman and United Hospice's former Volunteer Coordinator; in this role, Wood Smith reported to Marisa Kuropatkin ("Kuropatkin"), United Hospice's Manager of Bereavement Services, who, in turn, reported to Alvarado.  (*See* Defs.' 56.1 ¶ 4; Pls.' 56.1 ¶ 4.)

### 2.  Plaintiffs' Employment at United Hospice

Plaintiffs each claim that during their employment for United Hospice—and particularly over the course of the COVID-19 pandemic in 2020 and early 2021—they were subjected to discrimination, retaliation, and a hostile work environment via certain events that allegedly took place.  (*See generally* Compl.)  However, the record that has been provided to the Court by the Parties includes significant gaps, such that it is not clear to the Court, for instance, when most of these events took place or who was involved.  (*See generally* Defs.' 56.1; Pls.' 56.1.)  Moreover, the Parties have provided the Court with little documentary evidence to either corroborate testimony or fill in these and other missing details.  (*See generally* Decl. of Gregory B. Reilly in Supp. of Mot. ("Reilly Decl.") (Dkt. No. 68); Decl. of Stephen Bergstein in Opp'n to Mot. ("Bergstein Decl.") (Dkt. No. 74).)  Accordingly, the Court's recitation of the factual background of this Action is somewhat sparse and disjointed.

### a.  Alvarado's Employment at United Hospice

Alvarado claims that her employment at United Hospice was marred by discriminatory treatment, which ultimately led to her choice to file discrimination and retaliation charges with

4

the Equal Employment Opportunity Commission ("EEOC") on July 30, 2020 and ultimately, to voluntarily resign on January 29, 2021.[2]  (*See* Defs.' 56.1 ¶¶ 6, 8; Pls.' 56.1 ¶¶ 6, 8.)

First, Alvarado claims that she was treated differently from White directors at United Hospice with respect to certain administrative responsibilities.  All directors at United Hospice were required to take part in what was called the Administrator-on-Call ("AOC") rotation, wherein each director would be required to be on-call between 4:30PM and 8:30AM for a period of seven full days.  (*See* Reilly Decl. Exs. B–C (Dkt. Nos. 68-2, 68-3) & Bergstein Decl. Ex. 1 (Dkt. No. 74-2) ("Alvarado Dep."), at 207:11–19.)[3]  While on call, the directors would often need to answer referrals that would come in and speak to families.  (*See id.* at 208:9–17.) Between September and December 2019, Alvarado completed four one-week AOC rotations, (*see id.* at 210:19–25), and claims that she was not provided with a registered nurse to assist her, as other, White directors were, (*see id.* at 208:18–209:13).  Alvarado raised this issue to Pace, who formed a working group to address Alvarado's concerns that met on multiple occasions. (*See id.* at 212:19–213:3, 215:14–22.)  Based on these meetings, Pace adjusted the AOC model to provide for consistent nurse coverage, which remedied Alvarado's concerns.  (*See id.* at 216:4–20.)

Second, Alvarado claims that she was intentionally and unfairly excluded from certain leadership decisions made at United Hospice.  During the COVID-19 pandemic, the leadership team at United Hospice held daily meetings to discuss the changing guidance coming from New

---

[2] Alvarado received a right-to-sue letter on September 23, 2020.  (*See* Defs.' 56.1 ¶ 7; Pls.' 56.1 ¶ 7; Reilly Decl. Ex. A (Dkt. No. 68-1).)

[3] Both Plaintiffs and Defendants have filed excerpts of Plaintiffs' depositions, certain of which overlap.  For ease of reference, when citing to Plaintiffs' deposition testimony, the Court will refer to the Plaintiffs' depositions in general by page and line number rather than to the particular docket entry containing the relevant excerpt.

York state regarding COVID-19 and other staff and patient care issues, such as when staff would return to in-person work.  (*See* Defs.' 56.1 ¶ 21; Pls.' 56.1 ¶ 21; *see also* Alvarado Dep. 205:12–206:10.)  As the Director of Counseling Services, Alvarado attended these meetings alongside other high-level staff, including Peacock and Pace, who led the meetings.  (*See* Alvarado Dep. 206:6–23.)

However, Alvarado claims that she was left out of a number of other leadership meetings focusing on more specific projects, and therefore was excluded from certain decision making. (*See, e.g.*, *id.* at 180:7–18.)  For instance, during the initial phases of the COVID-19 pandemic, United Hospice was focused on how to provide and receive reimbursement from the Centers for Medicare and Medicaid Services ("CMS") for telemedicine services, and Alvarado claims that she was not included in these discussions.  (*See id.* at 180:14–18; Alvarado Decl. ¶ 11.)  As another example, Alvarado claims that after United Hospice received a large grant to encourage the hiring of Hispanic employees to better serve the needs of the Hispanic community in Rockland County, she was not permitted to play as large of a role as "was warranted under the circumstances."  (Pls.' 56.1 ¶ 20; *see also* Defs.' 56.1 ¶ 20.)  However, Alvarado conceded at her deposition that Pace consulted with her as Pace was working on the grant application; that Alvarado attended a kick-off meeting with the Board of Directors after United Hospice received the grant; that Alvarado ran a grant meeting alongside Donna Branca ("Branca"), the Director of Marketing, after the grant was awarded; and that Alvarado participated in at least one meeting with Pace, Nieves, and Aguilar to discuss whether Nieves and Aguilar could staff positions funded by the grant.  (*See* Alvarado Dep. 183:16–196:16.)  Alvarado also claims that she was not included in the decision-making process with respect to granting Nieves a COVID-19-related accommodation due to Nieves's immunocompromised status, even though Alvarado was

Nieves's supervisor.  (*See* Pls.' 56.1 ¶ 18.)  However, Alvarado conceded at her deposition that she was included on multiple emails in which Nieves's requested accommodation was discussed and participated in several meetings regarding the same topic.  (*See* Alvarado Dep. 153:23–169:16.)

Finally, Alvarado claims that she was not consulted when her office was relocated in May 2020 alongside at least nine other employees, including Wood Smith and some White employees.  (*See id.* at 199:17–202:3; Reilly Decl. Ex. P (Dkt. No. 68-16).)  Alvarado was told that the reason for her move was so she could be closer to the social work team that she supervised, and after the move, she was indeed closer to the social work team.  (*See* Alvarado Dep. at 200:12–19.)  However, Alvarado believes that the move "had nothing to do with office reorganization," but rather was "retaliation" for Alvarado speaking up about certain issues, *see infra*, and "to put [Alvarado] in [her] place" as a Hispanic woman.  (Alvarado Decl. ¶ 34.)

Third, Alvarado claims that she was repeatedly undermined by United Hospice leadership when attempting to perform her duties.  (*See, e.g.*, Alvarado Dep. 263:17–268:16.)  For instance, Alvarado attempted to file disciplinary charges against one of the White social workers she supervised, Grace Lembo ("Lembo"), for insubordination, and was prevented from doing so by Pace, Peacock, and Laura Clines ("Clines"), the Director of Human Resources.  (*See* Alvarado Decl. ¶ 16.)  By way of another example, Alvarado claims that she received constant, "harassing" calls to adjust Aguilar's working schedule, which Alvarado was responsible for managing.  (*See* Alvarado Dep. at 264:2–18.)  Alvarado also claims that she volunteered to lead an unidentified subcommittee, but at the conclusion of the subcommittee's work, she was not permitted to present her work to the Board of Directors, though other directors who led other subcommittees were permitted to present their work.  (*See id.* at 264:20–265:7.)

Finally, Alvarado claims that Pace and Peacock interfered with Alvarado's supervision of Wood Smith.  When Wood Smith was initially hired by United Hospice, she completed a six-month probationary period, which was later extended due to performance issues.  (*See* Alvarado Decl. ¶ 28.)  However, Alvarado did not agree with the decision to extend Wood Smith's probation because Alvarado only observed "one minor issue" with Wood Smith's performance, (*see id.*), but "was basically told that [she] needed to go along with" the decision, (Alvarado Dep. 263:17–23).  As Wood Smith continued her work at United Hospice, Alvarado felt that Pace "singled out Wood Smith for intense scrutiny and criticism."  (Alvarado Decl. ¶ 29.)  Alvarado complained to Clines about Pace's treatment of Wood Smith and certain other issues, and claims that as a result, Alvarado's office was moved.  (*Id.* ¶¶ 30–34.)

Fourth, Alvarado claims that disciplinary charges were unfairly filed against her.  All United Hospice employees were required to return to in-person work on May 26, 2020, (*see* Defs.' 56.1 ¶ 68; Pls.' 56.1 ¶ 68), and on June 2, 2020, Clines sent an email to all United Hospice managers and supervisors to confirm that all of their direct reports had returned to working in-person at United Hospice's offices, (*see* Reilly Decl. Ex. L (Dkt. No. 68-12) at 122:4–124:6).  Alvarado responded to Clines's email the following day to confirm that all of her direct reports were working on site, but Kuropatkin responded separately to tell Clines that Kuropatkin and Alvarado had agreed to allow Doreen Sheppard ("Sheppard") to continue to work remotely until certain additional arrangements could be made.  (*See id.* at 124:7–24)  On June 26, 2020, Peacock filed a "Plan of Corrective Action" against Alvarado based on this interaction, in which Peacock took issue with Alvarado's behavior because (1) the arrangements for Sheppard had already been made, (2) Alvarado was not meant to approve accommodations for her direct reports without consulting Peacock, and (3) Alvarado was not honest about allowing Sheppard to

continue working from home.  (*See* Reilly Decl. Ex. J ("Pace Decl.") (Dkt. No. 68-10), Ex. B.)

Alvarado claims that this disciplinary charge was unfair because Peacock had unilaterally

permitted Sister Maureen Robinson ("Robinson") to continue to work remotely due to

Robinson's advanced age and concomitant increased risk of developing a serious COVID-19

illness and was not similarly disciplined.  (*See* Pls.' 56.1 ¶ 13.)  However, Alvarado conceded at

her deposition that, in fact, Peacock discussed this decision as to Robinson with Alvarado and

Alvarado had agreed with the decision to allow Robinson to work remotely.  (*See* Alvarado

Dep. 178:13–180:6.)[4]  Alvarado also claims that Arthur Klepper ("Klepper"), United Hospice's

Director of Finance and a White man, allowed a subordinate to continue to work remotely and

was not disciplined, (*see* Alvarado Decl. ¶ 12), though the record is not clear as to whether

Klepper received permission to do so.

Fifth, Alvarado claims that unlike other department directors, Alvarado was expected to

take on patients if and when there was a sufficient increase in the number of patients that

required care.  (*See* Alvarado Decl. ¶ 27.)  Moreover, Alvarado was not provided with additional

---

[4] This is one example of many in which Alvarado attempts to distance herself from her own sworn deposition testimony via her declaration.  In her declaration, Alvarado attests that "Peacock lied during her deposition when she stated I was involved in the decision or in agreement to accommodate Robinson.  I was not involved."  (Alvarado Decl. ¶ 12.)  However, during her deposition, Alvarado testified to the following: "Q . . . So you and Judi Peacock discussed whether [Robinson] should be permitted to go with in-person patient visits, correct?  A  Yes.  Q  And you discussed it, and isn't it correct that you and [Peacock] agreed that it may not be a good idea – given her age and that she was frail, that it wouldn't be a good idea for her to do in-person visits?  True?  A  Yes, because she was older with chronic health issues." (Alvarado Dep. 178:22–179:8.)  However, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citing *Perma Research & Dev. Co. v. Singer Co.*, 41 F.2d 572, 578 (2d Cir. 1979)).  Therefore, while Alvarado may urge that Peacock made this decision unilaterally, the Court will not consider this claim to create an issue of fact.

compensation for taking on a patient caseload, though other, White directors were provided with additional compensation when their workload increased.  (*See id.*)

Notwithstanding the conduct laid out above, Alvarado confirmed that throughout her employment at United Hospice, she was never demoted and she never suffered a loss of pay or benefits.  (*See* Defs.' 56.1 ¶ 12; Pls.' 56.1 ¶ 12.)

### b.  Aguilar's Employment at United Hospice

Like Alvarado, Aguilar claims that her employment at United Hospice was marred by discriminatory treatment, which led her to also file discrimination and retaliation charges with the EEOC on July 30, 2020 and ultimately, to voluntarily resign on March 12, 2021.  (*See* Defs.' 56.1 ¶¶ 6, 9; Pls.' 56.1 ¶¶ 6, 9.)[5]

The crux of Aguilar's claims appear to be premised on her claim that the United Hospice workforce is "segregated by race," in that "[a]ll the spiritual advisors except one are White," "[a]lmost all the nurses are White," and yet "[m]ost of the full-time social workers who travel to the community homes and other care settings of patients and their families are Hispanic."  (Decl. of Ericka Aguilar in Opp'n to Mot. ("Aguilar Decl.") ¶ 5 (Dkt. No. 76).)[6]  Aguilar appears to claim that while certain (mostly White) care providers at United Hospice were not required to

---

[5] While there is no genuine dispute that the EEOC dismissed Aguilar's charges, (*see* Defs.' 56.1 ¶ 7; Pls.' 56.1 ¶ 7), it is not clear if Aguilar received a right-to-sue letter.  However, the Second Circuit has made clear that "the failure to exhaust administrative remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement," and therefore, an affirmative defense based on "the sufficiency of [a] plaintiff's administrative exhaustion" is "waivable."  *Francis v. City of New York*, 235 F.3d 763, 768, 766 (2d Cir. 2000) (citation omitted).  As such, to the extent an affirmative defense based on Aguilar's potential failure to procure a right-to-sue letter was available to Defendants, it is waived.

[6] Worth noting, however, is that it appears from the record that United Hospice only employed four social workers, two of whom were Hispanic—Aguilar and Nieves—and two of whom were White—Lembo and Mary Lynne Schiller ("Schiller")—indicating that only half of the social workers were Hispanic.  (*See* Pace Decl. ¶ 7.)

continue to conduct in-person visits with patients after the onset of the COVID-19 pandemic, the ("mostly" Hispanic) social workers were required to conduct in-person visits with patients and thus put themselves at risk of COVID-19 infection.  (*See id.* ¶ 8.)

Before the onset of the COVID-19 pandemic, social workers at United Hospice were required to make four in-person visits with patients per day, but when the COVID-19 pandemic started, this expectation dropped to two in-person visits with patients per day.  (*See* Defs.' 56.1 ¶ 22; Pls.' 56.1 ¶ 22.)  However, Aguilar testified at her deposition that she was not completing two in-person visits with patients per day because patients were not permitting social workers like herself into their homes due to the patients' concerns of COVID-19 exposure.  (*See* Reilly Decl. Exs. D & E (Dkt. Nos. 68-4, 68-5) & Bergstein Decl. Ex. 2 (Dkt. No. 74-3) ("Aguilar Dep."), at 87:3–19.)  As a result, Aguilar was pressured during employee meetings to increase her in-person visits, though Aguilar did not receive a cut in pay, a demotion, or a written warning for her failure to complete two in-person visits per day, nor was she terminated.  (*See id.* at 87:13–88:5.)  Moreover, it is worth noting that between March and June 2020, Aguilar conducted only 73 in-person visits with patients while Lembo conducted 96 in-person visits with patients and Schiller conducted 116 in-person visits, as demonstrated by data maintained by United Hospice's internal data management system.  (*See* Pace Decl. ¶¶ 11, 12, 14–20; *see also* Defs.' 56.1 ¶ 27.)  During the same period of time, the United Hospice nursing staff each conducted an average of 220.75 in-person visits.  (*See* Pace Decl. ¶¶ 11, 12, 14–20; *see also* Defs.' 56.1 ¶ 28.)[7]

---

[7] Aguilar disputes the accuracy of this data.  Aguilar claims that Lembo and Schiller "did not enter the patients' rooms, but still recorded them as in-person visits," alleging that Lembo "worked from the parking lot of [JRHR] and called the families on the telephone" and that Schiller "spoke with people out in the corridor, not in the patients' rooms."  (Aguilar Decl. ¶ 8.) However, Aguilar offers no record support for such allegations and the Court finds it highly

Aguilar also claims that there was an occasion in which she was unfairly reprimanded for allegedly failing to comply with certain COVID-19 safety guidelines.  One day, Aguilar and Nieves were sitting together in their office without wearing their masks, because the two were eating lunch.  (*See* Aguilar Dep. 244:13–16.)  Peacock saw Aguilar and Nieves in the office and later sent them both an email reminding them that they were required to wear masks when they were not social distancing.  (*See id.* at 244:16–25.)  Aguilar claims that this email was unfair because she and Nieves were socially distanced at the time and therefore were not violating any safety guidelines.  (*See* Aguilar Decl. ¶ 9.)  Moreover, Aguilar claims that Peacock "took no action at all after learning that other employees, who are White, were walking around the residence without masks."  (*Id.* ¶ 10.)  However, Aguilar acknowledged that as a result of this email, she did not receive a reduction in pay, she was not demoted, she was not terminated, and she did not receive any formal disciplinary charges.  (*See* Aguilar Dep. 245:18–246:11.)

Finally, Aguilar claims that she was improperly instructed to work with the husband of one of Aguilar's assigned patients, who was reported to behave in an erratic or dangerous manner.  (*See* Defs.' 56.1 ¶ 30; Pls.' 56.1 ¶ 30; *see also* Aguilar Dep. 71:23–72:7.)  United Hospice had been informed by the patient's family members that the patient's husband was

---

unlikely that Aguilar could have personally observed each and every one of Lembo and Schiller's appointments and the manner in which both Lembo and Schiller recorded these appointments on United Hospice's internal data management system—and Aguilar does not attest that she did.  (*See id.*)  "[W]here a party relies on affidavits . . . to establish facts, the statements '*must be made on personal knowledge*,'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (emphasis added) (quoting Fed. R. Civ. P. 56(c)(4)); "speculation alone is insufficient to defeat a motion for summary judgment," *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993)).  This is particularly true here, where Aguilar's speculation is—to be clear—that Lembo and Schiller each repeatedly committed health care fraud on the federal government, because United Hospice uses its internal data management system to submit billing to CMS.  (*See* Pace Decl. ¶ 12.)

behaving in this manner, and United Hospice staff had immediately put the facility on lockdown and called the police, who evaluated the individual and did not deem him to be a danger to himself or others.  (*See* Aguilar Dep. 64:19–65:10.)  The following day, Peacock told Aguilar that she and Aguilar had to meet with the patient's family to discuss the incident further; at the meeting, the patient's family gave Peacock and Aguilar more information about the individual's past behavior.  (*See id.* at 66:18–68:14.)  Later in the day, Aguilar learned that the individual was on his way to the United Hospice facility, and when he arrived, Peacock asked a nurse to tell Aguilar to speak to the individual to de-escalate the situation.  (*See id.* at 69:6–17.)  Aguilar did not feel comfortable exiting the facility to speak to the individual, who she feared could have a weapon, and so she waited to speak with him until he was permitted inside the facility.  (*See id.* at 72:8–73:11.)  Aguilar then spoke with the individual without incident.  (*See id.* at 76:13–77:20.)

### c.  Nieves's Employment at United Hospice

Like Alvarado and Aguilar, Nieves claims that her employment at United Hospice was marred by discriminatory treatment—on the basis of both her ethnicity and her disability—and that this led her to file discrimination and retaliation charges with the EEOC on July 30, 2020 and ultimately, to voluntarily resign on March 12, 2021.  (*See* Defs.' 56.1 ¶¶ 6, 10; Pls.' 56.1 ¶¶ 6, 10.)[8]

Nieves echoes many of Aguilar's claims.  First, Nieves shares Aguilar's belief that the United Hospice workforce is segregated by race and that the "mostly" Hispanic social workers were unfairly put at risk of COVID-19 infection by being required to continue to conduct in-

---

[8] As with Aguilar, there is no genuine dispute that the EEOC dismissed Nieves's charge, (*see* Defs.' 56.1 ¶ 7; Pls.' 56.1 ¶ 7), but it is not clear if Nieves received a right-to-sue letter.  To the extent an affirmative defense based on Nieves's potential failure to procure a right-to-sue letter was available to Defendants, it is waived.  *See supra* Note 5.

person visits.  (*See* Decl. of Wanda Aza Nieves in Opp'n to Mot. ("Nieves Decl.") ¶¶ 4–9 (Dkt.

No. 78).)  It is worth noting, however, that based on United Hospice's internal data management

system, between March and June 2020, Nieves conducted only 81 in-person visits with patients

while, again, Lembo conducted 96, Schiller conducted 116, and the nursing staff each conducted

an average of 220.75.  (*See* Pace Decl. ¶¶ 11, 12, 14–20.)[9]  And, in any event, Nieves was never

disciplined or suspended due to the number of in-person visits with patients she conducted.  (*See*

*id.* ¶ 23.)  Nieves also claims that she was unfairly reprimanded via Peacock's aforementioned

email for Nieves's alleged failure to comply with certain COVID-19 safety guidelines.  (*See*

Nieves Decl. ¶ 14.)[10]

Nieves also claims that via a variety of other events, she suffered disparate treatment on

the basis of her ethnicity.  On one occasion, Nieves was "written up for not conducting a

psychosocial assessment of a patient," (*id.* ¶ 13)—and told by Peacock that she "missed the boat"

on the patient, (*see* Reilly Decl. Exs. F & G (Dkt. Nos. 68-6, 68-7) & Bergstein Decl. Ex. 3 (Dkt.

No. 74-4) ("Nieves Dep."), at 97:13–21)—while Lembo was not written up for similarly failing

---

[9] Nieves disputes the accuracy of this data on the exact same basis as Aguilar disputes the accuracy of this data, (*see* Nieves Decl. ¶ 12), and the Court does not credit Nieves's objection on the same basis that the Court did not credit Aguilar's objection.  *See supra* Note 7.

[10] Similar to Aguilar, Nieves claims via her affidavit that White employees were not similarly reprimanded for failing to comply with COVID-19 safety guidelines.  (*See* Nieves Decl. ¶ 14.)  However, Nieves concedes that she does not have personal knowledge of the fact that these unidentified White employees were not reprimanded, explaining that she "often saw White employees at [United Hospice] facilities without masks during the pandemic," and "[a]s these co-workers never corrected their behavior, it may be reasonably *inferred* that they were not reprimanded for it."  (*Id.* (emphasis added).)  However, as the Court has explained, "where a party relies on affidavits . . . to establish facts, the statements '*must be made on personal knowledge*,'" *DiStiso*, 691 F.3d at 230 (emphasis added) (quoting Fed. R. Civ. P. 56(c)(4)); "speculation alone is insufficient to defeat a motion for summary judgment," *McPherson*, 457 F.3d at 215 n.4 (citing *Ying Jing Gan*, 996 F.2d at 532).  Therefore, Nieves's declaration cannot be used to establish that White employees were not reprimanded for failing to wear masks or create an issue of fact as to this point.

to conduct a psychosocial assessment on one of her patients, (Nieves Decl. ¶ 13).  On another

occasion, Nieves complained in writing to Clines about a co-worker who "made a racist

comment about the allegedly questionable qualifications of the Hispanic employees hired by

United Hospice," and while Clines instructed the co-worker to apologize to Nieves, the co-

worker never did.  (*Id.* ¶ 15.)  Finally, during a training on how to properly use personal

protective equipment ("PPE"), Nieves and Aguilar were asked to share PPE to use for the

training, while Lembo was given her own PPE to use.  (*See id.* ¶ 16.)

Finally, Nieves claims that United Hospice failed to satisfactorily accommodate her

disability, as requested.  On May 4, 2020—after conducting only one in-person visit to a patient

in the month of April 2020, (*see* Pace Decl. ¶ 20)—Nieves requested a disability accommodation

to excuse her from entering the homes of patients in which the patient or a family member was

COVID-19 positive and from entering nursing homes due to Nieves's increased risk of serious

disease from a COVID-19 infection based on Nieves's immunocompromise status, (*see* Nieves

Decl. ¶ 10; Nieves Decl. Ex. 1 (Dkt. No. 78-1)).[11]  On May 22, 2020, Clines responded to

Nieves's request via a letter in which Clines wrote: "While we are not able to provide you with

the specific accommodations you requested at this time due to the burden it would place on our

organization as well as your essential job functions, we would like to discuss other alternatives

with you in an effort to accommodate you."  (Nieves Decl. Ex. 2 (Dkt. No. 78-2).)  Clines

explained that while United Hospice had allowed some employees to work remotely during the

COVID-19 pandemic, "that arrangement is not sustainable" because United Hospice "has not

---

[11] In her declaration, Nieves claims that she requested this accommodation in "early March 2020," (Nieves Decl. ¶ 10), but the letter by which she requested her accommodation is dated May 4, 2020, (*see* Nieves Decl. Ex. 1).  The Court will therefore conclude that Nieves's declaration contains a typographical error.

been able to bill any of the remote services [Nieves] and other social workers have provided."
(*Id.*)  Clines then proposed an alternate accommodation by which United Hospice would
"provid[e] [Nieves] full and robust [PPE] to help protect [her] and minimize the chances that
[she] will contract the virus," listing the PPE that United Hospice planned to provide, which
"exceed[ed] what the CDC guidance suggests or requires."  (*Id.*)  Further, Clines explained that
United Hospice would "continue to make tremendous efforts in creating a safe work
environment in general," including by providing employees with cleaning equipment, increasing
cleaning frequency, and "creating safe workspaces" via office reorganization.  (*Id.*)  At the
conclusion of the letter, Clines invited Nieves to "provide other proposals, as soon as possible,
for ways [United Hospice] can explore accommodating [Nieves] and addressing [Nieves's]
safety concerns, while allowing [her] to perform the essential functions of [her] job," and advised
Nieves that she would be permitted to continue working remotely until they were able to arrive at
a mutually acceptable accommodation.  (*Id.*)

Nieves rejected Clines's May 22, 2020 proposal, (*see* Nieves Decl. ¶ 10), and on June 3,
2020, Clines offered Nieves a temporary accommodation via a letter in which she explained that
"for up to six (6) weeks: (1) [Nieves] will not be required to conduct in-person visits to
nursing/adult homes; (2) [Nieves] will not be required to provide in-person visits to patient
homes, where [Nieves] or [United Hospice] has direct knowledge that the patient (or his/her
family member) is COVID-19 positive and is actively infectious . . . ; and (3) [Nieves] will
provide in-person visits/services to patients at [JRHR] who are either COVID-19 negative or
[are] no longer infectious."  (Nieves Decl. Ex. 4 (Dkt. No. 78-4).)  Clines advised that United
Hospice would continue to provide "significant PPE (beyond what is required)" and at the
conclusion of the six weeks, Clines would "meet with [Nieves] to revisit the situation and discuss

whether continued or different accommodations would be needed or appropriate at that time, and what they would be."  (*Id.*)

### d.  Wood Smith's Employment at United Hospice

Finally, Wood Smith claims that her employment at United Hospice was marred by discriminatory treatment, which ultimately led to her choice to file discrimination and retaliation charges with the EEOC on July 30, 2020 and ultimately, to voluntarily resign on February 12, 2021.  (*See* Defs.' 56.1 ¶¶ 6, 11; Pls.' 56.1 ¶¶ 6, 11.)[12]

First, Wood Smith claims that individuals at United Hospice—including Pace and Peacock—spoke to her in a demeaning manner because of her race.  For example, Wood Smith explained during her deposition that while "no one has outwardly said [she is] stupid," individuals at United Hospice would give her instructions "in a broken down morsels as though [she] will not be able to understand."  (Reilly Decl. Exs. H & I (Dkt. Nos. 68-8, 68-9) & Bergstein Decl. Ex. 4 (Dkt. No. 74-5) ("Wood Smith Dep."), at 79:9–16.)  On another occasion, Wood Smith attempted to attend a team meeting and Peacock asked, "What is she doing here?"—referring to the fact that at that time, Wood Smith did not have any volunteers to coordinate because volunteers had chosen to stop working due to COVID-19—in what Wood Smith felt to be a disrespectful tone.  (*See id.* at 95:7–19; *see also id.* at 92:12–20.)  There was also an occasion where Pace scolded Wood Smith about the fact that volunteers had stopped working.  (*See* Decl. of Marie Wood Smith Decl. in Opp'n to Mot. ("Wood Smith Decl.") ¶ 9 (Dkt. No. 77).)

---

[12] As with Alvarado and Nieves, there is no genuine dispute that the EEOC dismissed Wood Smith's charge, (*see* Defs.' 56.1 ¶ 7; Pls.' 56.1 ¶ 7), but it is not clear if Wood Smith received a right-to-sue letter.  To the extent an affirmative defense based on Wood Smith's potential failure to procedure a right-to-sue letter was available to Defendants, it is waived.  *See supra* Notes 5 & 8.

Wood Smith also claims that her receipt of a what she characterizes as a poor performance review was the result of discrimination.  Wood Smith was originally hired by United Hospice in December 2019, began working as United Hospice's Volunteer Coordinator in January 2020, and was placed on a six-month probationary period as a matter of course.  (*See* Reilly Decl. Ex. K (Dkt. No. 68-11) 31.)  Wood Smith received a special five-month performance review for the period from January to May 2020 in June 2020, and several areas for improvement were identified alongside many areas of strength.  (*See id.* at 31–37.)  Specifically, the review indicates that Wood Smith has an "ability to connect to [United Hospice's] volunteers [as] evident in the relationships that she has built with the current active volunteers," "is dedicated to her position as evidence in the time and energy she puts into her role as Volunteer Coordinator," and "builds relationships with other agencies in the community."  (*Id.*)  However, Wood Smith was noted to have "issues specific to her communication with colleagues"; namely, that "[t]he perception of some is that she can [come] across abrupt in situations," even when "this is not [her] intention whatsoever."  (*Id.*)  Therefore, the review indicates that "there is a need to show significant improvement over the next 7 weeks in the areas of administrative skills as it relates to the volunteer program, improved relationships with her coworkers as reflected in [United Hospice's] shared values statement, and the ability to effectively collaborate with all departments within the agency."  (*Id.*)  Kuropatkin, Alvarado, Peacock, and Clines all signed the review.  (*See id.*)

Wood Smith felt that this performance review was "false and discriminatory" and lodged a complaint with United Hospice.  (*See* Wood Smith Decl. ¶ 8.)  Thereafter, Wood Smith's office was moved.  (*See id.*)

Wood Smith received another review seven weeks later, in July 2020, in which zero areas for improvement were identified.  (*See* Reilly Decl. Ex. K. 38–44.)  Specifically, the July review indicates that "[t]his performance review demonstrates the positive impact of providing . . . Wood Smith with ongoing feedback, support, and supervision" because Wood Smith "has significantly improved in the areas[] highlighted in her initial performance review." (*Id.* at 43)  Wood Smith "was able to complete all set goals, with marked improvement in her ability to maintain a professional tone."  (*Id.*)

B.  Procedural History

Plaintiffs filed their Complaint on December 21, 2020.  (*See* Compl.)  On February 16, 2021, Defendants filed their Answer.  (*See* Answer.)  The Parties attempted to mediate on April 9, 2021, but this effort was unsuccessful.  (*See* Dkt. (entries for Mar. 22, 2021 and Apr. 19, 2021).)  Thereafter, the Court entered a Case Management Order, (*see* Dkt. No. 28), and the Parties proceeded to discovery, (*see* Dkt. Nos. 30–57).

On December 31, 2021, Defendants filed a pre-motion letter in anticipation of moving for summary judgment.  (*See* Dkt. No. 58.)  After receiving a response from Plaintiffs, (*see* Dkt. No. 59), the Court held a pre-motion conference and set a briefing schedule, (*see* Dkt. (minute entry for Jan. 13, 2022); Dkt. No. 61).  On February 22, 2022, Defendants filed their Motion, supporting papers, and Rule 56.1 Statement.  (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 65); Defs.' 56.1; Reilly Decl.)  On April 4, 2022, Plaintiffs filed their Opposition, supporting papers, and Rule 56.1 Statement.  (*See* Pls.' Mem. in Opp'n to Mot. ("Pls.' Mem.") (Dkt. No. 73); Bergstein Aff.; Alvarado Decl.; Aguilar Decl.; Wood Smith Decl.; Nieves Decl.; Pls.' 56.1.)  On May 13, 2022, Defendants filed their Reply.  (*See* Defs.' Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply Mem.") (Dkt. No. 81).)

<u>II.  Discussion</u>

<u>A.  Standard of Review</u>

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia*, 17 F.4th at 354; *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

 "However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)

20

(quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading.").  Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."  *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases."  (citation and quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso*, 691 F.3d at 230 (quoting FED. R. CIV. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (quotation marks omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"). However, "[a]lthough witness credibility is usually a question of fact for the jury, 'broad, conclusory attacks on the credibility of a witness will not, by themselves, present question of material fact' for trial." *Desia v. GE Life & Annuity Assurance Co.*, 350 F. App'x 542, 544 (2d Cir. 2009) (summary order) (citation and alteration omitted) (quoting *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005)); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations omitted) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998))), *aff'd*, 367 F. App'x 178 (2d Cir. 2010). As such, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify affirmative

evidence from which a jury could find that the non-moving party has carried its burden of proof." *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (citation and alterations omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

### B.  Analysis

Plaintiffs collectively bring nine causes of action against Defendants, alleging that: (1) United Hospice discriminated against all Plaintiffs and created a hostile work environment for all Plaintiffs on the basis of their race and ethnicity, in violation of Title VII, (*see* Compl. ¶¶ 87–98); (2) United Hospice retaliated against Alvarado, Nieves, and Wood Smith, in violation of Title VII, (*see id.* ¶¶ 99–105); (3) all Defendants discriminated against all Plaintiffs and created a hostile work environment for all Plaintiffs on the basis of their race and ethnicity, in violation of § 1981, (*see id.* ¶¶ 106–13); (4) all Defendants retaliated against Alvarado, Nieves, and Wood Smith, in violation of § 1981, (*see id.* ¶¶ 114–20); (5) United Hospice discriminated against all Plaintiffs and created a hostile work environment for all Plaintiffs on the basis of their race and ethnicity, in violation of the NYSHRL, (*see id.* ¶¶ 121–26); (6) Pace and Peacock aided and abetted United Hospice's discrimination against and creation of a hostile work environment for all Plaintiffs on the basis of their race and ethnicity, in violation of the NYSHRL, (*see id.* ¶¶ 127–32); (7) United Hospice retaliated against Alvarado, Nieves, and Wood Smith, in violation of the NYSHRL, (*see id.* ¶¶ 133–39); (8) Pace and Peacock aided and abetted United Hospice's retaliation against Alvarado, Nieves, and Wood Smith, in violation of the NYSHRL,

(*see id.* ¶¶ 140–45); and (9) United Hospice failed to reasonably accommodate Nieves's disability, in violation of the ADA, (*see id.* ¶¶ 146–154).

Defendants seek summary judgment on all of Plaintiffs' claims, arguing primarily that: (1) Plaintiffs' discrimination claims fail because none of Plaintiffs can demonstrate that she suffered an adverse employment action, or even assuming arguendo that Plaintiffs could demonstrate that they suffered adverse employment actions, none of these actions took place under circumstances giving rise to an inference of discrimination, (*see* Defs.' Mem. 6–21); (2) Plaintiffs' retaliation claims fail because neither Alvarado, Nieves, nor Wood Smith can demonstrate that Defendants took an adverse action against her, (*see id.* at 23–27); (3) Plaintiffs' hostile work environment claims fail because Plaintiffs cannot connect any of the treatment they claim to have received to their races and ethnicities, (*see id.* at 27–32); (4) Nieves's disability discrimination claim fails because she cannot connect any of the treatment she claims to have received to her disability and because the undisputed evidence demonstrates that Nieves received her requested accommodation, (*see id.* at 33–35); and (5) Plaintiffs' claims against Pace and Peacock fail because there is no evidence that either harbored any animus, (*see id.* at 35–36). Defendants also argue that Defendants are entitled to summary judgment on any constructive discharge claims that Plaintiffs may be attempting to raise, including because Plaintiffs did not make any constructive discharge claims in their Complaint. (*See id.* at 21–23.)

The Court will address these arguments to the extent necessary to decide the instant Motion, but at the outset, the Court notes that via their Opposition to Defendants' Motion, Plaintiffs have abandoned a number of their Title VII, § 1981, and NYSHRL claims. While Plaintiffs brought their Title VII, § 1981, and NYSHRL claims for discrimination and hostile work environment on behalf of all Plaintiffs and their Title VII, § 1981, and NYSHRL claims for

retaliation on behalf of Alvarado, Nieves, and Wood Smith, (*see* Compl. ¶¶ 87–139), Plaintiffs

have only included in their Opposition to Defendants' Motion: (1) Alvarado's Title VII, § 1981,

and NYSHRL discrimination claim; (2) Alvarado, Aguilar, Nieves, and Wood Smith's Title VII,

§ 1981, and NYSHRL hostile work environment claims; and (3) Alvarado and Wood Smith's

Title VII, § 1981, and NYSHRL retaliation claims, (*see* Pls.' Mem. 20–36).  Plaintiffs have also

included Nieves's ADA failure to accommodate claim, (*see id.* at 36–39), but have not included

any mention of a constructive discharge claim on behalf of any Plaintiff, (*see generally id.*).

Courts routinely hold that where a plaintiff "fails to address [the] defendants' arguments against

or even mention several of [his or her] claims," those claims are deemed "abandoned."  *Robinson*

*v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 & n.65 (S.D.N.Y. Sept. 30,

2009) (collecting cases); *see also Scott v. JPMorgan Chase & Co.*, No. 13-CV-646, 2014 WL

338753, at *2 (S.D.N.Y. Jan. 30, 2014) ("[T]he [p]laintiff's opposing [m]emorandum of [l]aw

does not respond to this argument, and effectively concedes these arguments by his failure to

respond to them." (citation omitted)).  Therefore, the Court finds that Plaintiffs have abandoned

the following claims: (1) Aguilar, Nieves, and Wood Smith's Title VII, § 1981, and NYSHRL

discrimination claims; (2) Nieves's Title VII, § 1981, and NYSHRL retaliation claim; and

(3) any constructive discharge claims.[13]  The Court will examine only Plaintiffs' remaining

claims in ruling on Defendants' Motion.

---

[13] While Plaintiffs did not include a claim that Nieves was discriminated against on the basis of her disability in violation of the ADA (instead claiming only that United Hospice failed to reasonably accommodate Nieves's disability), Defendants have argued in their brief that Defendants are entitled to summary judgment on Nieves's disability discrimination claim, as the Court explained above.  *See supra*.  Plaintiffs include no mention of any such disability discrimination claim in their Opposition.  (*See generally* Pls.' Mem.)  Therefore, to the extent Plaintiffs have attempted to bring a disability discrimination claim on behalf of Nieves, that claim is also abandoned.

### 1.  Alvarado's Discrimination Claim

Title VII prohibits discrimination against an employee based on that employee's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  The NYSHRL echoes this prohibition and adds to it, prohibiting discrimination against an employee based on that employee's "age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence."  N.Y. Exec. Law § 296(1).  Finally, § 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The Second Circuit has construed this provision to prohibit employment discrimination on the basis of race.  *See Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 260–61 (2d Cir. 2000) (holding that § 1981 covers claims of employment discrimination brought both by employees working under contract and at-will employees).

Claims of discrimination under all three statutes are analyzed pursuant to the familiar three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016) ("Claims of . . . discrimination under Title VII and the NY[S]HRL are analyzed under the familiar burden-shifting framework established in *McDonnell Douglas* . . . ."); *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) ("[The plaintiff's] disparate treatment claim under Title VII [and] § 1981 [are] subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*." (citing *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010))); *Zheng-Smith v. Nassau Health Care*

*Corp.*, 486 F. Supp. 3d 611, 620–21 (E.D.N.Y. 2020) ("Claims for race and national origin discrimination under Title VII, [the] NYSHRL, and . . . § 1981 are all analyzed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*."), *aff'd*, 2021 WL 4097316 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1675 (2022).  "Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie case of employment discrimination by showing that: '(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'"  *Farmer v. Shake Shack Enters.*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (quoting *Menaker v. Hofstra Univ*, 935 F.3d 20, 30 (2d Cir. 2019)); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (establishing the same criteria).  "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal."  *Walsh*, 828 F.3d at 75 (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)).  "The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct," and "[u]pon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination."  *Farmer*, 473 F. Supp. 3d at 324 (citing *Littlejohn*, 795 F.3d at 307–08); *see also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) ("[T]he final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.").

Defendants appear to concede—or at least do not contest for purposes of their Motion—that Alvarado (1) is a member of a protected class as a Hispanic woman and (2) was qualified for the position she held at United Hospice.  (*See* Defs.' Mem. 6–11; *see generally* Defs.' Reply Mem.)  However, Defendants argue that Plaintiffs cannot establish a prima facie case of

discrimination against Alvarado because the record evidence demonstrates that Alvarado did not

suffer an adverse employment action. (*See* Defs.' Mem. 6–8.) And, even assuming arguendo

that Plaintiffs could demonstrate that Alvarado suffered an adverse employment action, Plaintiffs

cannot present any evidence to suggest that Defendants' actions occurred under circumstances

giving rise to an inference of discrimination against Alvarado and the record evidence

demonstrates that Defendants had legitimate, non-discriminatory reasons for the actions it took

with regard to Alvarado. (*See id.* at 8–11.) The Court agrees.

### a. Adverse Employment Action

"An adverse employment action is 'a materially adverse *change* in the terms and

conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting

*Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). The Second Circuit

has instructed that:

> To be materially adverse, a change in working conditions must be more disruptive
> than a mere inconvenience or an alteration of job responsibilities. Examples of
> such a change include termination of employment, a demotion evidenced by a
> decrease in wage or salary, a less distinguished title, a material loss of benefits,
> significantly diminished material responsibilities, or other indices unique to a
> particular situation.

*Id.* (quoting *Sanders*, 361 F.3d at 755); *see also Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir.

2015) (holding similarly). "Moreover, while 'there is no exhaustive list of what constitutes an

adverse employment action,' courts have also held that 'denial of promotion, addition of

responsibilities, involuntary transfer that entails objectively inferior working conditions, denial

of benefits, denial of a requested employment accommodation, denial of training that may lead to

promotional opportunities, and shift assignments that make a normal life difficult for the

employee, among other things, constitute adverse employment actions'" under certain

circumstances. *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013)

(quoting *Little v. NBC*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002)).

      Critically, however, both the Second Circuit and courts within the Second Circuit have

made clear that many negative personnel actions taken by employers do not constitute adverse

employment actions sufficient to establish a prima facie case of employment discrimination.  For

instance, "an employee does not suffer a materially adverse change in the terms and conditions

of employment where the employer merely enforces its preexisting disciplinary policies in a

reasonable manner." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).  Moreover, "criticism of

an employee (which is part of training and necessary to allow employees to develop, improve[,]

and avoid discipline) is not an adverse employment action." *Tepperwien v. Entergy Nuclear

Ops., Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273

F.3d 76, 83 (2d Cir. 2001)); *see also Sanders*, 361 F.3d at 756 (finding that negative performance

evaluation did not constitute an adverse employment action where the plaintiff "offered no proof

that this evaluation had any effect on the terms and conditions of her employment").  Indeed,

even "reprimands and excessive scrutiny do not constitute adverse employment actions in the

absence of other negative results such as a decrease in pay or being placed on probation."

*Dawson v. City of New York*, No. 09-CV-5348, 2013 WL 4504620, at *10 (S.D.N.Y. Aug. 19,

2013) (alteration and citation omitted); *see also Costello v. N.Y. State Nurses Ass'n*, 783

F. Supp. 2d 656, 677–78 (S.D.N.Y. 2011) (finding that "giving negative performance

evaluations; . . . attempting to 'overload' [the plaintiff] to 'cause her to be deficient in her job

performance;' failing to provide her with necessary information and/or support, thereby 'setting

her up to fail' and 'engaging in conduct designed to result in discipline;' and 'inundating her

with emails and questions regarding her work performance'" did not qualify as adverse

employment actions where the plaintiff "suffered no demotion, material loss of benefits, or significantly diminished material responsibilities" (alterations omitted)).  Further, "[c]hanges in assignments or responsibilities that do not 'radically change' the nature of work are not typically adverse employment actions."  *Potash*, 972 F. Supp. 2d at 584 (alteration omitted) (quoting *Galabya v. N.Y.C. Dep't of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

Finally, "adverse employment actions . . . must be 'more than trivial, insubstantial, or petty.'"  *Colon v. Fashion Inst. of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 288 (S.D.N.Y. 2013) (quoting *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011)); *see id.* (finding that supervisor's "taking [the plaintiff's] bathroom keys, . . . insistence that she get a mannequin on one occasion, and . . . 'talking down' to [the plaintiff]" did not constitute adverse employment actions (alteration omitted)); *see also Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 20-CV-6199, 2022 WL 973861, at *7 (S.D.N.Y. Mar. 30, 2022) ("[The plaintiff's] claims that [two individuals] harassed and demeaned her do not constitute adverse employment actions." (citing *Culmone-Simeti v. N.Y.C. Dep't of Educ.*, No. 17-CV-2313, 2018 WL 3384437, at *7 (S.D.N.Y. July 11, 2018)); *LeeHim v. N.Y.C. Dep't of Educ.*, No. 17-CV-3838, 2017 WL 5634128, at *4 (S.D.N.Y. Nov. 21, 2017) (explaining that "'petty slights,' such as shushing" and "rude and intemperate conduct" do not amount to adverse employment actions).  Indeed, the Supreme Court has explained that "Title VII . . . does not set forth 'a general civility code for the American workplace.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Here, it is clear that none of the conduct identified by Plaintiffs constitutes adverse

employment action sufficient to establish a prima facie case of discrimination under Title VII,

§ 1981, or the NYSHRL.

Plaintiffs claim that Alvarado suffered adverse employment action in the form of

"micromanagement and being written up for matters that comparable White supervisors were not

reprimanded for," "being left out of important supervisory matters and denied sufficient staff

support," "being undermined in her daily responsibilities," and "being denied additional

compensation for an increased workload."  (Pls.' Mem. 22.)  But none of these actions

constitutes adverse employment actions sufficient to sustain a discrimination claim in the

absence of a materially adverse change in the terms and conditions of Alvarado's employment—

such as a demotion, a decrease in pay, or termination—which Alvarado indisputably did not

experience.  *See supra* I.A.2.a.  *See Paul*, 97 F. Supp. 3d at 190 ("[The] [p]laintiff's complaint

that he should receive more pay to compensate him for having more assignments is an

employment-related grievance amounting to dissatisfaction with his working conditions that

cannot qualify as an adverse employment action." (alterations and quotation marks omitted));

*Dawson*, 2013 WL 4504620, at *10 ("[R]eprimands and excessive scrutiny do not constitute

adverse employment actions in the absence of other negative results such as decrease in pay or

being placed on probation." (alteration and citation omitted)); *Costello*, 783 F. Supp. 2d at 678

(explaining that "failing to provide [the plaintiff] with necessary information and/or support,

thereby 'setting her up to fail,'" did not constitute an adverse employment action); *Hill v.

Rayboy-Brauestein*, 467 F. Supp. 2d 336, 354 (S.D.N.Y. 2006) (explaining that "[the]

[d]efendants' alleged micro-management of [the] [p]laintiff [cannot] constitute an adverse

31

employment action" because "[e]xcessive scrutiny, without more, does not constitute an adverse employment action" (citation omitted)).

Plaintiffs urge the Court to consider these "negative personnel actions" collectively as actionable adverse employment action, (*see* Pls.' Mem. 20–21), but even if Plaintiffs were permitted to proceed on such a theory—which is, at least, uncertain, (*see* Defs.' Reply Mem. 4–5)—the Court's conclusion is unchanged because "the collective impact never resulted in any *material* change to the terms and conditions of [Alvarado's] employment." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 218 (E.D.N.Y. 2014). As the Second Circuit observed in the retaliation context: "Individually the actions were trivial, and placed in context they remain trivial. Taken in the aggregate, the actions still did not affect [Alvarado] in any material way. 'Zero plus zero is zero.'" *Tepperwien*, 663 F.3d at 572 (quoting *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998)). Accordingly, the Court finds that Alvarado has failed to carry her burden of demonstrating that she suffered an adverse employment action sufficient to make out a prima facie case for employment discrimination under Title VII, § 1981, or the NYSHRL.

### b. Causation

Having determined that Alvarado has failed to demonstrate that she suffered an adverse employment action, the Court need not go any further in granting summary judgment to Defendants on Alvarado's Title VII, § 1981, or NYSHRL discrimination claim. But even assuming arguendo that Plaintiffs could demonstrate that Alvarado suffered an adverse employment action via the conduct described above, *see supra* I.A.2.a., the Court would still find that Plaintiffs have failed to establish a prima facie case of discrimination for failure to demonstrate causation.

"Under Title VII[,] [§ 1981], and the NYSHRL, a plaintiff need not prove . . . that 'the causal link between injury and wrong is so close that the injury would not have occurred but for the act.'" *Farmer*, 473 F. Supp. 3d at 325–26 (quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019)). "So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Lenzi*, 944 F.3d at 107 (emphasis omitted) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nasser*, 570 U.S. 338, 343 (2013)). "The necessary inference may be derived from a variety of circumstances, including 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Detouche v. JTR Transp. Corp.*, No. 17-CV-7719, 2020 WL 7364116, at *10 (S.D.N.Y. Dec. 14, 2020) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded by statute on other grounds*).

Here, Plaintiffs appear to be proceeding on a comparator theory of causation: that "[p]referential treatment [was] given to employees outside the protected class." (Pls.' Mem. 23.) While as indicated above, "[a] showing of disparate treatment—that is, a showing that an employer treated [the] plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purpose of making out a prima facie case,'" *Ruiz*, 609 F.3d at 493 (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)), Plaintiffs have clearly not met their burden of identifying an appropriately similarly-situated comparator to Alvarado.

33

Plaintiffs appear to have attempted to identify only one actual comparator—Peacock—and otherwise simply make repeated, oblique reference to various "comparable White supervisors."  (Pls.' Mem. 23.)  First, it is axiomatic that to "make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee," *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001), Alvarado must actually identify a similarly situated employee; vague references to "comparable White supervisors" are not sufficient, *see Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 767 (E.D.N.Y. 2018) (granting summary judgment to the defendants on Title VII gender discrimination claim where "the [p]laintiff has not identified a single similarly-situated female employee"); *see also Mazurkiewicz v. N.Y.C. Transit Auth.*, 810 F. Supp. 563, 566 (S.D.N.Y. 1993) ("It is insufficient to state in opposition to summary judgment . . . that material facts will be adduced and proved at trial.  If enough evidence is not presented, there will not be a trial; it is not enough merely to promise that at trial some evidence will turn up.").  And, Peacock and Alvarado are clearly not similarly situated, particularly with respect to the matter for which Plaintiffs attempt to use Peacock as a comparator.  Plaintiffs attempt to argue that Peacock's disciplinary charge against Alvarado for approving an accommodation for Sheppard without Peacock's approval was discriminatory because Peacock approved an accommodation for Robinson and suffered no consequences.  (*See* Pls.' Mem. 23–24.)  But this argument is nonsensical.  Peacock was Alvarado's supervisor and the issue with Alvarado's approval of an accommodation for Sheppard was that Alvarado did not seek permission to do so *from Peacock*.  (*See* Pace Decl. Ex. B (explaining that Alvarado "created an accommodation for an employee without going through any approval process")).)  Clearly, Peacock did not need to seek her own permission to grant an accommodation to Robinson.  Indeed, if anything, this incident makes clear that Alvarado and Peacock were not

similarly situated.  *See Smalls v. Amazon.com Servs. LLC*, No. 20-CV-5492, 2022 WL 356432, at *6 (E.D.N.Y. Feb. 7, 2022) ("Supervisors are not similarly situated employees." (citation omitted)); *Garcia v. Barclays Cap., Inc.*, 281 F. Supp. 3d 365, 387 (S.D.N.Y. 2017) ("It is self-evident that a manager does not hold substantially the same position as the individuals she manages.").[14]  Accordingly, the Court finds that Plaintiffs have failed to carry their burden of establishing a prima facie case of discrimination against Alvarado under Title VII, § 1981, or the NYSHRL for the additional reason that Plaintiffs have failed to demonstrate causation.

The Court need not and will not address Defendants' argument that United Hospice had legitimate, non-discriminatory reasons for the actions it took with regard to Alvarado. Defendants' Motion as to Alvarado's discrimination claim is granted.

### 2.  Alvarado & Wood Smith's Retaliation Claims

"Title VII forbids an employer from discriminating against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participating in any manner in any investigation, proceeding, or hearing under this subchapter.'" *Farmer*, 473 F. Supp. 3d at 330 (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)).  "The NYSHRL similarly makes it

---

[14] Plaintiffs offer no argument with respect to whether Klepper is an appropriate comparator in their brief, (*see* Pls.' Mem. 23–24), but to the extent Plaintiffs attempt to advance this argument, it does not change the Court's conclusion.  To "raise[] an inference of discrimination by showing that she was subjected to disparate treatment," a plaintiff "must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  The only evidence whatsoever that Plaintiffs have offered concerning Klepper is that Klepper is United Hospice's Director of Finance and apparently allowed a subordinate employee to continue to work remotely after United Hospice resumed in-person operations.  *See supra* I.A.2.a.  This is clearly insufficient to demonstrate that Alvarado and Klepper are "similarly situated in all material respects."  *Graham*, 230 F.3d at 39 (citation omitted).  Again, to defeat summary judgment, "it is not enough merely to promise that at trial some evidence will turn up."  *Mazurkiewicz*, 810 F. Supp. at 566.

unlawful for an employer to retaliate or discriminate against an employee because she 'has

opposed any practices forbidden under this article or because . . . she has filed a complaint,

testified[,] or assisted in any proceeding under this article.'" *Id.* (alteration in original) (quoting

N.Y. Exec. Law § 296(7)).  Additionally, the Supreme Court has held that § 1981 "prohibits not

only racial discrimination but also retaliation against those who oppose it."  *Nassar*, 570 U.S. at

355.

  "The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation

claims under [all three statutes]."  *Summa v. Hofstra*, 708 F.3d 115, 125 (2d Cir. 2013) (referring

to Title VII and the NYSHRL) (citing *Schiano*, 445 F.3d at 609); *see also Littlejohn*, 795 F.3d at

315 ("Retaliation claims under Title VII and § 1981 are both analyzed pursuant to Title VII

principles and the *McDonnell Douglas* burden-shifting evidentiary framework." (footnote

omitted)); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010)

("Retaliation claims made under . . . § 1981, like those made under Title VII, are evaluated using

a three-step burden-shifting analysis.").  "To make out a prima facie case of retaliation, a

plaintiff must demonstrate that '(1) she engaged in a protected activity; (2) the employer was

aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a

causal connection between the protected activity and that adverse action.'"  *Kelly v. Howard I.

Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (italics

omitted) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).  "Once a prima

facie case of retaliation is established, the burden of production shifts to the employer to

demonstrate that a legitimate, non[-]discriminatory reason existed for its action."  *Summa*, 708

F.3d at 125 (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).  "If the employer

demonstrates a legitimate, non-discriminatory reason, then 'the burden shifts back to the plaintiff

to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'" *Id.* (alterations omitted) (quoting *Raniola*, 243 F.3d at 625). "Significantly, a plaintiff alleging retaliation in violation of Title VII must show at the final step of the analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision." *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Nassar*, 570 U.S. at 348, 360).

Defendants primarily argue that Plaintiffs cannot establish prima facie cases of retaliation against Alvarado and Wood Smith because they cannot demonstrate that Alvarado and Wood Smith suffered any materially adverse actions and, in any event, Defendants had legitimate, non-retaliatory reasons for the actions it took with regard to Alvarado and Wood Smith. (*See* Defs.' Mem. 25–26.) The Court agrees that Defendants are entitled to summary judgment on Alvarado and Wood Smith's retaliation claims, though not entirely for the reasons Defendants provide.

Construing the facts in the light most favorable to Plaintiffs as the non-movants, as the Court must, *see Torcivia*, 17 F.4th at 345, the Court finds that both Alvarado and Wood Smith engaged in protected activity of which Defendants were aware by lodging internal complaints with United Hospice regarding Pace's treatment of Wood Smith. *See supra* I.A.2.a., I.A.2.d. *See Bowen-Hooks*, 13 F. Supp. 3d at 222 (explaining that for purposes of demonstrating that a plaintiff engaged in protected activity, "[t]he complaint can be informal—an employee does not need to lodge a formal complaint of discrimination" (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000))); *but see Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107–08 (2d Cir. 2011) (per curiam) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or reasonably could have understood, that the plaintiff's complaint was directed at *conduct prohibited by Title VII*."

(alteration and citation omitted)).  Plaintiffs argue that after Alvarado and Wood Smith made

these complaints, Defendants retaliated against them by moving both of their offices and later

filing disciplinary charges against Alvarado for approving an accommodation for Sheppard

without permission.  (*See* Pls.' Mem. 33–34.)  However, the Court finds that office relocation

does not constitute an adverse action sufficient to establish a prima facie case of retaliation under

Title VII, § 1981, or the NYSHRL and Defendants had a legitimate, non-retaliatory reason for

filing disciplinary charges against Alvarado, which Plaintiffs cannot demonstrate were

pretextual.

"To establish an adverse employment action for purposes of a retaliation claim, 'a

plaintiff must show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination.'"  *Bowen-Hooks*, 13 F. Supp. 3d

at 224 (quoting *Fincher*, 604 F.3d at 721).  "The scope of actions that may be materially adverse

for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title

VII's anti-discrimination provisions; the latter apply to the terms and conditions of employment,

while the former 'anti-retaliation protection is broader and extends beyond workplace-related or

employment-related retaliatory acts and harms.'"  *Id.* at 224–25 (quoting *Hicks v. Baines*, 593

F.3d 159, 165 (2d Cir. 2010)).  However, the Supreme Court has made clear that even in the

retaliation context, "it is important to separate significant from trivial harms."  *Burlington*, 548

U.S. at 68.  And, courts in the Second Circuit have held that the "decision to relocate [the

plaintiff] to a different, allegedly inferior, office space" is "at most, the sort of 'minor

annoyance[],' that do[es] not rise to the level of actionable retaliation under Title VII."  *Moccio*

*v. Cornell Univ.*, 889 F. Supp. 2d 539, 586–87 (S.D.N.Y. 2012) (quoting *Millea v. Metro-N. R.R.*

*Co.*, 658 F.3d 154, 165 (2d Cir. 2011)), *aff'd*, 526 F. App'x 124 (2d Cir. 2013); *see also Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198, 208 (S.D.N.Y. 2011) (explaining that "the [c]ourt is not persuaded that" "assignments to a shared office and to an office without a telephone or computer access" "are the type of actions that would have deterred a reasonable employee from engaging in protected activity" (citation omitted)).  Accordingly, Plaintiffs cannot demonstrate a prima facie case of retaliation based on the relocation of Alvarado and Wood Smith's offices.[15]

Unlike office relocation, however, "[a] formal reprimand can be an adverse action for purposes of a retaliation claim, 'even when the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently,' because 'it can reduce an employee's likelihood of receiving future bonuses, raises, or promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy.'"  *Bowen-Hooks*, 13 F. Supp. 3d at 227 (alteration omitted) (quoting *Millea*, 658 F.3d at 165).  Therefore, the filing of disciplinary charges against Alvarado does constitute an adverse action for purposes of Alvarado's retaliation claim.  This does not ultimately save Alvarado's retaliation claim from summary judgment, however, because Defendants have offered a legitimate, nonretaliatory reason for filing disciplinary charges against her, which is that Alvarado, in fact, committed the misconduct for which she was disciplined by failing to seek approval for Sheppard's accommodation as required.  *See supra* I.A.2.a.  Plaintiffs do not deny that Alvarado committed

---

[15] Moreover, Defendants have proffered evidence that Alvarado and Wood Smith's offices were moved as part of a broader office reorganization in which at least eleven employees' offices were moved, (*see* Reilly Decl. Ex. P), and Plaintiffs have proffered no evidence apart from Alvarado and Wood Smith's own unsupported speculation, (*see* Alvarado Decl. ¶ 34; Wood Smith ¶ 8), to demonstrate that this legitimate, non-retaliatory reason for the office moves was pretextual.  *See Jean v. Acme Bus Corp.*, No. 08-CV-4885, 2012 WL 4171226, at *14 (E.D.N.Y. Sept. 19, 2012) ("[The] [p]laintiff's personal belief is insufficient to satisfy his burden of pretext." (citing *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996))).

this misconduct (even if she feels she should not have been reprimanded for it), *see supra* I.A.2.a., and have put forth no evidence to demonstrate pretext.  *See Jean*, 2021 WL 4171226, at *15 ("It is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext." (alteration and quotation marks omitted)); *see also Gonzalez v. City of New York*, 845 F. App'x 11, 17–18 (2d Cir. 2021) (summary order) (affirming grant of summary judgment on claim that "the initiation of the disciplinary charges was in retaliation for [the plaintiff's] filing of a claim" where "[the plaintiff] cannot demonstrate that the charges were false and has provided no evidence from which a rational jury could find that the initiation of the charges was a pretext for retaliation.").

Therefore, Defendants' Motion as to Alvarado and Wood Smith's retaliation claims is granted.

### 3.  Plaintiffs' Hostile Work Environment Claims

Finally, Title VII, § 1981, and the NYSHRL each prohibit employers from subjecting employees to a hostile work environment.  *See Littlejohn*, 795 F.3d at 320 (explaining that "[t]he phrase terms, conditions, or privileges of employment [in Title VII] evinces a congressional intent to strike at the entire spectrum of disparate treatment, which includes requiring people to work in a discriminatorily hostile or abusive environment" (alteration omitted) (quoting *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012))); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) ("Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment."); *see also* N.Y. EXEC. LAW § 296(1)(a).  Here, again, claims under all three statutes are judged under broadly the same standard.  *See Littlejohn*, 795 F.3d at 320–21 (applying same standard to hostile work

environment claims brought under Title VII and § 1981); *Zheng-Smith*, 486 F. Supp. 3d at 623 ("As with discrimination, analyses of hostile work environment claims under federal and New York law are coextensive."); *Farmer*, 473 F. Supp. 3d at 334 ("Hostile work environment claims under Title VII and the NYSHRL are judged by the same standard." (citing *Summa*, 708 F.3d at 123–24)).[16]

    "A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* (citing *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (quoting *Perry*, 115 F.3d at 149). Moreover, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile

---

[16] The only difference amongst the various standards is that "[o]n October 11, 2019, amendments to the NYSHRL came into effect that eliminated the 'severe and pervasive standard,'" such that plaintiffs now need only to show only that they were "subjected to inferior terms, conditions, or privileges of employment because of the individual's membership in one or more protected categories." *Tortorici v. Bus-Tev, LLC*, No. 17-CV-7507, 2021 WL 4177209, at *13 (S.D.N.Y. Sept. 14, 2021).

environment or through such concrete deprivations as being fired or being denied a promotion, is

actionable under Title VII only when it occurs because of an employee's sex, or other protected

characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (citing *Oncale*, 523 U.S.

at 79–80); *see also Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("In

other words, an environment which is equally harsh for both men and women or for both young

and old does not constitute a hostile working environment under the civil rights statutes.").  And

in making this determination, "the courts have consistently emphasized that the ultimate issue is

the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups*

within the workplace." *Brown*, 257 F.3d at 252  (citing *Connecticut v. Teal*, 457 U.S. 440, 453–

54 (1982)).

Defendants argue that they are entitled to summary judgment on Plaintiffs' hostile work

environment claims because there is no genuine dispute of material fact that the conduct

Plaintiffs identify as creating a hostile work environment was entirely unrelated to Plaintiffs'

race or ethnicity.  (Defs.' Mem. 28.)  The Court, again, agrees.

Starting with Alvarado.  Plaintiffs identify the same actions by United Hospice in support

of Alvarado's hostile work environment claim as her discrimination claim, namely:

(1) "micromanagement and being written up for matters that comparable White supervisors were

not reprimanded for"; (2) "being left out of important supervisory matters and denied sufficient

staff support"; (3) "being undermined in her daily responsibilities"; and (4) "being denied

additional compensation for an increased workload."  (Pls.' Mem. 22 & n.1, 32.)  But "[a]part

from [Plaintiffs'] unsupported and conclusory assertions to the contrary," these events "are

neutral as to [Alvarado's] [race and ethnicity]" and Plaintiffs "ha[ve] pointed to no record

evidence supporting the inference that the abovementioned incidents of alleged mistreatment

occurred 'because of' any of [Alvarado's] protected characteristics." *Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303, 2013 WL 1316712, at \*13 (E.D.N.Y. Mar. 28, 2013).[17]  And, "it is well established that [a] plaintiff's 'feelings and perceptions of being discriminated against are not evidence of discrimination.'"  *Id.* (quoting *Lee v. Sony BMG Music Emtm't, Inc.*, No. 07-CV-6733, 2010 WL 743948, at \*9 (S.D.N.Y. Mar. 3, 2010)); *see also Figueroa v. City of New York*, No. 00-CV-7559, 2002 WL 31163880, at \*3 (S.D.N.Y. Sept. 27, 2002) ("[The plaintiff's] responses that the conduct occurred because she is a woman are conclusory and therefore fail to raise a genuine issue of fact as to gender animus."), *aff'd*, 118 F. App'x 524 (2d Cir. 2004).

While in *Alfano*, the Second Circuit advised that "[f]acially neutral incidents may be included . . . among the 'totality of circumstances' that courts consider in any hostile work environment claim," the plaintiff must still offer "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."  *Alfano*, 294 F.3d at 378.  In so holding, the *Alfano* court cited *Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir. 2000), in which the Second Circuit had found that the "fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually derogatory statements," *id.* (citing *Howley*, 217 F.3d at 155–56).  Here, while Plaintiffs have "offer[ed] a laundry list of facially neutral allegations in an attempt to establish that the hostility of [Alvarado's] work environment at [United Hospice] was because of her [race or ethnicity]," Plaintiffs "ha[ve] failed to present any evidentiary basis to infer that the incidents alleged were based on [Alvarado's] [race, ethnicity,] or otherwise animated by discriminatory intent."

---

[17] Of course, Alvarado's claim that she was "written up for matters that comparable White supervisors were not reprimanded for" is not phrased in an facially race- and ethnicity-neutral manner, but Plaintiffs' phrasing is not dispositive and, in any event, as the Court has already explained, *see supra* II.B.2., Alvarado's claim that Peacock (and perhaps Klepper) is a "comparable White supervisor[]" is plainly not supported by the evidence.

*Petrisch*, 2013 WL 1316712, at *14.  Therefore, Defendants are entitled to summary judgment on Alvarado's hostile work environment claim.

The Court turns now to Aguilar and Nieves, whose claims for hostile work environment Plaintiffs have argued jointly.  (*See* Pls.' Mem. 28–30.)  Plaintiffs appear to argue that Aguilar and Nieves were subjected to a hostile work environment because (1) "they were pressured to make additional in-person visits beyond the two-visit requirement"; (2) they were reprimanded for not following COVID-19 safety guidelines on a single occasion; and (3) they were asked to share PPE equipment for purposes of training on proper PPE use.  (*Id.*)  Plaintiff also argue that Aguilar was subjected to a hostile work environment when she was asked to help deescalate a situation involving a family member of one of Aguilar's patients.  (*See id.* at 30.)  Aguilar and Nieves's hostile work environment claims fail for the same reasons that Alvarado's hostile work environment claim fails: there is simply no evidence in the record to support the notion that any of this alleged mistreatment occurred because of Aguilar and Nieves's race or ethnicity.  *See supra*.  As the Second Circuit has observed:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano*, 294 F.3d at 377.  Defendants are also entitled to summary judgment on Aguilar and Nieves's hostile work environment claims.[18]

_____

[18] While Plaintiffs have not pursued this theory in support of Nieves's hostile work environment claim, the Court briefly addresses Nieves's claim—made in her deposition—that Peacock's comment that Nieves "missed the boat" on a patient was a discriminatory comment about Nieves's Hispanic identity "[b]ecause Hispanics are known to come across on boats." (Nieves Dep. 97:13–98:5.)  Even if a single stray remark could establish a hostile work environment—which it cannot, *see Hawana v. City of New York*, 230 F. Supp. 2d 518, 533 (S.D.N.Y. 2002) ("An isolated remark is woefully insufficient to rise to the level of harassment required to overcome a motion for summary judgment.")—this remark is clearly not actionable.

Finally, the Court addresses Wood Smith's hostile work environment claim.  Plaintiffs appear to argue that Wood Smith was subjected to a hostile work environment because (1) "[s]he was continually treated in a disrespectful manner" and (2) "her performance reviews stated she fell below expectations in certain areas."  (Pls.' Mem. 31–32.)  Wood Smith's claim fails for the same reason her co-Plaintiffs' claims failed, because here, again, Plaintiffs have put forth no evidence to support the notion that any of this alleged mistreatment occurred because of Wood Smith's race.  *See supra*.  Moreover, Plaintiffs' theory that "the jury may find that the overall racial environment at United Hospice explains [Wood Smith's] otherwise unexplainable treatment," (Pls.' Mem. 31), runs directly counter to the Second Circuit's instruction that "the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace."  *Brown*, 257 F.3d at 252.  Defendants are thus entitled to summary judgment on Wood Smith's hostile work environment claim.

Therefore, Defendants' Motion as to Alvarado, Aguilar, Nieves, and Wood Smith's hostile work environment claims is granted.

### 4.  Plaintiffs' Claims Against Pace & Peacock

Although generally, "'claims brought under [the NYSHRL] are analytically identical to claims brought under Title VII,'" "[o]ne notable exception to this rule is that, while an individual defendant . . . may not be held personally liable under Title VII, an individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in

---

Put simply, no reasonable jury could find that the expression "missed the boat"—an exceedingly common idiom in American English—by itself is derogatory toward Hispanic people, one population among many that is "known" to immigrate to the United States on boats.  *Cf. Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In essence, [the] plaintiff alleges that because he was yelled at, this must have been because he was 'an effeminate, gay, Jewish older white man.'  Such conclusory and speculative statements are insufficient.").

the conduct giving rise to a discrimination claim." *Rojas*, 660 F.3d at 107 n.10 (quoting *Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir. 1997)); *see also Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., Indus. Emps., Warehousemen, Helpers & Miscellaneous Workers, Greater N.Y. & Vicinity, Loc. Union No. 812*, 425 F. Supp. 3d 234, 243 (S.D.N.Y. 2019) (same).  Section 296(6) provides that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden under [the NYSHRL], or attempt to do so."  N.Y. Exec. Law § 296(6).  Moreover "individuals may be held liable under § 1981," if a plaintiff can "demonstrate some affirmative link to causally connect the actor with the discriminatory action."  *Whidbee*, 223 F.3d at 75 (quotation marks omitted); *see also Sosa v. Medstaff, Inc.*, No. 12-CV-8926, 2014 WL 4377754, at *7 (S.D.N.Y. Sept. 4, 2014) ("Unlike Title VII, . . . § 1981 permits the imposition of individual liability." (citation omitted)).

In order for a defendant to be liable as an aider and abettor under § 296(6) of the NYSHRL, a plaintiff must first establish the existence of a primary violation of the NYSHRL by an employer or principal.  *See Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1013 (N.Y. 2004) ("[B]ecause [the] plaintiff has failed to raise a triable issue of material fact that she was either retaliated against or discriminated against because of her race, her claims that [the] defendants aided and abetted each other in any discrimination or retaliation cannot survive."); *Kelly G. v. Bd. of Educ. of City of Yonkers*, 952 N.Y.S.2d 229, 232 (App. Div. 2012) ("The plaintiffs cannot impose liability on the Board for aiding and abetting a violation of the [NYSHRL] pursuant to Executive Law § 296(6) where, as here, no violation of the [NYSHRL] has been established.").  As discussed above, Plaintiffs cannot establish a primary violation of the NYSHRL by United Hospice for discrimination, retaliation, or creation of a hostile work environment.  Therefore, Pace and Peacock cannot be liable for aiding and abetting any such

violation.  *See White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (noting that where a plaintiff "has not demonstrated a primary violation, there can be no liability for aiding and abetting"); *Benjamin v. Metro. Transp. Auth.*, No. 07-CV-3561, 2012 WL 3188764, at *20 (S.D.N.Y. Aug. 2, 2012) ("Because [the] [p]laintiff is not able to establish a primary violation [against his employer], the [i]ndividual [d]efendants . . . cannot be liable for aiding and abetting."); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007) ("[A]ccessory liability [under the NYSHRL] may only be found where a primary violation has been established.").  Defendants are therefore entitled to summary judgment on Plaintiffs' aiding and abetting claims under the NYSHRL.

Plaintiffs' individual § 1981 claims against Pace and Peacock fare no better.  "Personal liability under [§] 1981 must be predicated on the actor's personal involvement," *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) (quotation marks omitted), and it is axiomatic that Pace and Peacock could not have been personally involved in discriminatory action against Plaintiffs when the Court has already found that Plaintiffs were not subject to any discriminatory action, *cf. Sosa*, 2014 WL 4377754, at *7 ("[O]ur conclusion that [the] plaintiff has not stated a claim for which relief can be granted applies with equal force against both the institutional and individual defendants; essentially, there is no 'discriminatory action' with which [the individual defendants] may have been personally involved." (citation omitted)).  Defendants are therefore entitled to summary judgment on Plaintiffs' individual § 1981 claims against Pace and Peacock.

Defendants' Motion as to Plaintiffs' individual NYSHRL and § 1981 claims against Pace and Peacock is granted.

### 5. Nieves's Failure to Accommodate Claim

A defendant violates the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas*." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quotation marks omitted) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)). To make out a prima facie failure-to-accommodate claim under the ADA, a plaintiff must demonstrate that:

> (1) [the] plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Id.* at 125–26 (quotation marks omitted) (quoting *McBride*, 583 F.3d at 97); *accord Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (same). "Once [the] plaintiff [has] satisfied his burden of 'production and persuasion as to the existence of an accommodation that is facially reasonable,' the burden 'shifts to the defendant to rebut the reasonableness of the proposed accommodation,' which 'is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship.'" *Frilando v. N.Y.C. Transit Auth.*, 463 F. Supp. 3d 501, 514 (S.D.N.Y. 2020) (quoting *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016)).

Defendants appear to concede—or at least do not contest for purposes of their Motion— that (1) Nieves is a person with a disability under the meaning of the ADA, (2) United Hospice is covered by the ADA and had notice of Nieves's disability, and (3) with reasonable

accommodation, Nieves could perform the essential functions of her job as a social worker at United Hospice.  (*See* Defs.' Mem. 34–35; *see generally* Defs.' Reply Mem.)  However, Defendants argue that Plaintiffs cannot establish a prima facie case of failure-to-accommodate under the ADA because the record evidence demonstrates that United Hospice provided Nieves with a reasonable accommodation.  (*See* Defs.' Mem. 34.)  The Court agrees.

"'The reasonableness of an employer's accommodation is a fact-specific question that often must be resolved by a factfinder,'" but "[w]here an employer has already taken or offered measures to accommodate the disability in question, 'the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable.'" *Frilando*, 463 F. Supp. 3d at 515 (quoting *Noll*, 787 F.3d at 94).  Here, the Court finds that the accommodation United Hospice provided to Nieves was plainly reasonable.  The undisputed evidence demonstrates that on May 4, 2020, Nieves requested a disability accommodation to "excuse [Nieves] from entering the homes of patients in which the patient or a member of the patient's family was [COVID-19] positive, and from seeing patients in nursing homes."  (Nieves Decl. ¶ 10.)  After a short back-and-forth with Clines in which Clines explained that allowing Nieves to solely work remotely would impose an undue hardship on United Hospice because United Hospice was not able to bill for Nieves's remote services and invited Nieves to provide other proposals for an accommodation, *see supra* I.A.2.c., on June 3, 2020, Clines offered Nieves the exact accommodation she requested for a period of six weeks.  Specifically, Clines explained that "(1) [Nieves] will not be required to conduct in-person visits to nursing/adult homes; (2) [Nieves] will not be required to provide in-person visits to patient homes, where [Nieves] or [United Hospice] has direct knowledge that the patient (or his/her family member) is COVID-19 positive and is actively infectious . . . ; and (3) [Nieves] will provide in-person visits/services to

patients at [JRHR] who are either COVID-19 negative or [are] no longer infectious."  (Nieves
Decl. Ex. 4.)  Clines explained that after the six-week period, Clines would meet with Nieves to
revisit the accommodation and determine whether the accommodation was still required.  (*See
id.*)  Therefore, the only difference between the accommodation Nieves requested and the
accommodation Nieves received is that the accommodation Nieves received was presumptively
limited to six weeks; the Court finds that Nieves cannot demonstrate that this time limitation was
unreasonable where Defendants have explained that United Hospice was not receiving
compensation for Nieves's remote work (and therefore could not reasonably allow Nieves to
work remotely indefinitely) and United Hospice affirmatively left open the option that the six-
week period could be extended.

The Second Circuit has explained that "employers are *not required* to provide a perfect
accommodation or the very accommodation most strongly preferred by the employee," *Noll*, 787
F.3d at 94 (emphasis added), so where, as here, the employer *has* for all intents and purposes
provided the "very accommodation most strongly preferred by the employee," *id.*, the employee
clearly cannot succeed on a failure-to-accommodate claim, *cf. Sosa v. N.Y.C. Dep't of Educ.*, 368
F. Supp. 3d 489, 524 (E.D.N.Y. 2019) ("Because [the] [d]efendants did attempt to, and did,
accommodate [the] [p]laintiff, she fails to state a plausible failure to accommodate claim under
the ADA." (alterations and citation omitted)).  Therefore, Defendants' Motion as to Nieves's
ADA claim is granted.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.  The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 64); enter judgment for United Hospice, Pace, and Peacock; and close this case.

SO ORDERED.

Dated:    September 27, 2022
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge